IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

PAMELA J. DEES,

Plaintiff,

v.

BOB EVANS FARMS, INC.,

Defendant.                                                                  No. 03-CV-850-DRH

MEMORANDUM AND ORDER

HERNDON, District Judge:

### I. Introduction

On December 15, 2003, Plaintiff Pamela J. Dees ("Dees") filed a complaint against Defendant Bob Evans Farms, Inc., alleging sexual harassment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), **42 U.S.C. § 2000, *et seq.*** (Count I) and disability discrimination in violation of the Americans with Disabilities Act ("ADA"), **42 U.S.C. § 12101, *et seq.*** (Count II) **(Doc. 1)**. On May 10, 2004, Plaintiff filed an Amended Complaint adding a third count against Defendant for the intentional infliction of emotional distress ("IIED") (Count III) **(Doc. 16)**. Now before the Court is Defendant's Motion for Summary Judgment **(Doc. 32)**. Plaintiff opposes the motion **(Doc. 34)**. For the reasons set forth below, the Court grants Defendant's Motion for Summary Judgment **(Doc. 32)**.

## II. Background

The facts repeated her are unabridged and for an adult reader. Plaintiff was hired by Defendant in March 2001 at its Fairview Heights restaurant to work as a server earning $3.09 per hour **(Doc. 34, Pl.'s Ex. 21 Deposition of Pamela Dees at 93 (hereinafter "Dees Dep. at ___") & Pl.'s Ex. 8)**. In May or June 2001, Plaintiff became a server/trainer **(Dees Dep. at 123)**. As a server/trainer, Plaintiff was responsible for training new servers at the restaurant, and when acting in that capacity, was paid an increased hourly rate of as much as $7.00 per hour **(Dees Dep. at 139; Deposition of Mike Triffo at 119-20 (hereinafter "Triffo Dep. at ___"))**.

In August 2001, Plaintiff had a heart attack at Bob Evans and was rushed to the hospital by ambulance **(Dees Dep. at 73-74, 130, 305)**. On her return to work, Plaintiff requested that she be able to sit down once in a while to rest and Defendant accommodated her request **(Dees Dep. at 306 & Pl.'s Ex. 14, Decl. of Anton Arnold dated Dec. 16, 3002 at ¶ 5)**.

In December 2001, Kristine Smock ("Smock"), the assistant general manager at Defendant's Fairview Heights restaurant, was transferred to a Bob Evans restaurant in Kansas City to assume the position of general manager **(Dees Dep. at 79-81, 114)**. Ramona Epps ("Epps") replaced Smock as assistant general manager at the Fairview Heights restaurant.

During her deposition, Plaintiff testified that the first time Epps made

a comment directly to her was in January 2002 when Epps "came to [her] and was talking to [her] . . . about giving the customers head and how they tasted, that she was having sex with her landlord and giving him head" **(Dees Dep. at 114)**. Plaintiff recalled telling Epps, "don't be saying that . . . I don't want to hear that . . . I'm waiting on them customers" **(Dees Dep. at 116)**. Plaintiff also testified that she reported Epps' comments to Tony Arnold, the store's general manager, and Kristine Smock **(Dees Dep. at 116)**. Plaintiff was told by Arnold that he would talk to Epps, and Smock directed Plaintiff to Arnold **(Dees Dep. at 117)**.

Plaintiff testified that the next remark Epps made in her presence was to Larry Graham, another server/trainer. Dees stated that Epps "would make very sexual remarks to him here and there occasionally about him getting it in the rear end and did he like it and those type of things or who are you fucking this week, Larry" **(Dees Dep. at 117-18)**. Plaintiff reported the remarks to Arnold who Plaintiff claimed laughed in response **(Dees Dep. at 118-19)**.

In March 2002, Plaintiff was again taken to the hospital from Bob Evans because of a heart problem **(Dees Dep. at 130-31)**. In April 2002, Plaintiff recalled that another coworker told Epps that he had sex with Wendy (a sixteen year old waitress at Bob Evans) the night before, went down on her, ate her, and she stunk real bad **(Dees Dep. at 120-21)**. According to Plaintiff, Epps said back to him "you have to somehow take your fingers, put them up her, bring your fingers up so you can smell to see if she's clean down there before you eat her. All women don't stink

that bad" **(Dees Dep. at 121)**. Plaintiff confronted Epps about talking to kids in this manner and reported Epps' conduct to Arnold **(Dees Dep at 120-22)**.

After Plaintiff went to Arnold about Epps, Plaintiff claimed Epps stopped talking to her **(Dees Dep. at 135-36)**. Plaintiff explained: "[I]f I went to Tony [Arnold] about anything that had to do with her clocking me out, had to do with her talking to the kids, had to do with anything I didn't think was quite right going on in there, she would go through these stages and wouldn't talk to me two weeks at a time. She would send other employees to tell me to have people do their outs, to have somebody go home, to put whoever in certain sections, but she wouldn't tell me to go do it. She would send another employee to come tell me to go do it" **(Dees Dep. at 136)**. Furthermore, according to Plaintiff, on April 29, 2002, Plaintiff asked Epps for her work schedule and Epps asked her why she just doesn't quit **(*Id.*)**.

In May 2002, Plaintiff heard Epps saying "sexual stuff" to the teenage servers at the restaurant **(Dees Dep. at 143-44)**. In front of Plaintiff and other female servers, Epps told two teenage male servers they should have sex with Plaintiff because she was older and could give better head **(Dees Dep. at 144)**. Plaintiff again reported Epps to Arnold, and this time told Arnold that she wanted to talk to Kevin Anderchick, the area director **(Dees Dep. at 146)**. Arnold told Plaintiff he would take care of it.

On June 24, 2002, Plaintiff overheard Epps telling a boy how Epps likes to suck dick and have her pussy eaten **(Dees Dep. at 156-57)**. Epps also told the

boy that "I told you before you need to be with someone older like Pambula so she can give you better head" **(Dees Dep. 157)**. Plaintiff got so upset she clocked-out and left the store **(*Id.*)**. On July 3, 2002, Plaintiff was told by Arnold that she could come back to work and that if she had any further problems with Epps, she was to work them out because he was tired of hearing them **(Dees Dep. at 166)**. After Plaintiff returned to work, Epps scheduled her to work as a hostess instead of a server, put her in slower stations, and "cut" her early **(Dees Dep. at 166-67)**.

On August 2, 2002, Plaintiff fell at a local Home Depot store while shopping, injuring her elbow **(Dees Dep. at 172)**. She was off work on medical leave from August 2 to about October 10, 2002 **(Dees Dep. at 189-93)**. After her return, Plaintiff was told by Epps she was demoted from server/trainer to server because of her heart condition **(Dees Dep. at 197)**. According to Plaintiff, Epps gave her training duties to a young man by the name of Josh who was not as experienced or qualified as Plaintiff **(Dees Dep. at 155-56)**. On that same day, Plaintiff was present when Epps told a young woman server that the only time guys don't think she is ugly is when they see the back of her head while she is giving "head" **(Dees Dep. at 197-98)**. Plaintiff submitted her resignation giving two-weeks notice and handed it to Epps. Epps then told Plaintiff to get out of her "fucking store" through another employee **(Dees Dep. at 203)**.

During the week of October 14, 2002, Arnold and the new area director, Triffo, were on a company-sponsored cruise for Bob Evans' managers **(Dees Dep at**

**195; Triffo Dep. at 44-45)**.  On October 15, 2002, Plaintiff telephoned Stan Robbins, the Human Resources Department Manager, and told him about Epps' conduct and about being demoted and about her repeated complaints and that she felt forced to turn in her resignation **(Dees Dep. at 208-09)**.  Robbins told her not to quit, he would speak to Arnold or Triffo and tell them to give back her resignation.  According to Plaintiff, he guaranteed it would be taken care of **(*Id.*)**.

Triffo and Arnold returned from their cruise on or about October 19, 2002, and Triffo called Plaintiff on October 19, 2002 after hearing a voicemail message from Robbins **(Dees Dep. at 215)**.  Plaintiff told Triffo about the problems with Epps and about turning in her resignation **(*Id.*; Triffo Dep. at 81-82; Pl.'s Exs. 4 & 5)**.  They agreed to meet at the restaurant the following morning to discuss the matter further **(Triffo Dep. at 54-55)**.

On October 21, 2002, Plaintiff met with Triffo at the restaurant.  She told him she had consulted a lawyer and that she wanted Triffo to speak to her lawyer before he interviewed her and repeatedly told him as well as Arnold that she wanted to rescind her resignation **(Dees Dep. at 227-31)**.  According to Plaintiff, Triffo told Plaintiff that her resignation would stand, took away her open door rights and told her specifically that until her last day of work she could not go to any employee or manager for help and if she needed help, she could "call her lawyer." **(Dees Dep. at 231)**.  On that same day, Epps admitted making the sexual comments to employees and was fired **(Triffo Dep. 157-58; Pl.'s Ex. 12)**.

### III. Analysis

#### A. Summary Judgment Standard

Summary judgment is proper where the pleadings and affidavits, if any, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." **FED. R. CIV. P. 56(c);** *Wyatt v. UNUM Life Ins. Co. of Am.,* **223 F.3d 543, 545 (7th Cir. 2000);** *Oates v. Discovery Zone,* **116 F.3d 1161, 1165 (7th Cir. 1997) (citing** *Celotex Corp. v. Catrett,* **477 U.S. 317, 322 (1986))**. The movant bears the burden of establishing the absence of factual issues and entitlement to judgment as a matter of law. *Wollin v. Gondert,* **192 F.3d 616, 621-22 (7th Cir. 1999)**. The Court must consider the entire record, drawing reasonable inferences and resolving factual disputes in favor of the non-movant. *Schneiker v. Fortis Ins. Co.,* **200 F.3d 1055, 1057 (7th Cir. 2000);** *Baron v. City of Highland Park,* **195 F.3d 333, 337-38 (7th Cir. 1999)**.

In reviewing a summary judgment motion, the Court does not determine the truth of asserted matters, but rather decides whether there is a genuine factual issue for trial. *EEOC v. Sears, Robuck & Co.,* **233 F.3d 432, 436 (7th Cir. 2000)**. No issue remains for trial "unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* **477 U.S. 242, 249-50 (1986)**. **Accord** *Starzenski v. City of Elkhart,* **87 F.3d 872, 880 (7th Cir. 1996),** *cert.*

*denied*, 519 U.S. 1055 (1997); *Tolle v. Carroll Touch, Inc.,* 23 F.3d 174, 178 (7th Cir. 1994).

### B.  Hostile Environment Sexual Harassment Claim

Title VII forbids an employer,

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . .

42 U.S.C. § 2000e-2(a)(1).  The purpose of this provision is to prevent "'disparate treatment of men and women in employment,'" regardless of its form. *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 78 (1998)(quoting *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 64 (1986)).  Whenever, therefore, "'the workplace is permeated with *discriminatory* intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated.'" *Id.* (emphasis added) (quoting *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21 (1993)).

The plaintiff may establish a violation of Title VII by proving that she was subjected to a hostile work environment.  To establish a prima facie case of hostile environment sexual harassment, a plaintiff must demonstrate that: (1) she was subjected to unwelcome sexual harassment; (2) the harassment was based on

sex; (3) "the sexual harassment had the effect of unreasonably interfering with the plaintiff's work performance in creating an intimidating, hostile or offensive working environment that affected seriously the psychological well-being of the plaintiff;" and (4) there is a basis for employer liability. ***Parkins v. Civil Constructors of Illinois, Inc.,* 163 F.3d 1027, 1032 (7th Cir. 1998);** *see also* ***Hall v. Bodine Elec. Co.,* 276 F.3d 345, 355 (7th Cir. 2002)**. The third prong of the prima facie case requires both a subjective and objective inquiry, compelling the court to ask whether a reasonable person would find the environment hostile. ***See Haugerud v. Amery Sch. Dist.,* 259 F.3d 678, 693 (7th Cir. 2001)(citation omitted)**.

In evaluating whether a workplace is hostile the court looks to all the circumstances, "including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." ***Ngeunjuntr v. Metropolitan Life Ins. Co.,* 146 F.3d 464 (7th Cir. 1998)(quoting *Harris,* 510 U.S. at 23)**. In ***Perry v. Harris Chernin, Inc.,* 126 F.3d 1010, 1013 (7th Cir. 1997)**, the Seventh Circuit stated: The question is "whether the plaintiff was, because of her sex, subjected to such hostile, intimidating, or degrading behavior . . . as to affect adversely the conditions under which she worked." ***Id.* (quoting *Carr v. Allison Gas Turbine Div., General Motors Corp.,* 32 F.3d 1007, 1009 (7th Cir. 1994))**. Clearly, the kind of language here was not pleasant and not the kind of language most people would like to encounter in the workplace.

However, not every unpleasant workplace is a hostile environment. The "occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers" would be neither pervasive nor offensive enough to be actionable. ***Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 430 (7th Cir. 1995)**. The workplace that is actionable is the one that is "hellish." *Id.*

Defendant argues that Plaintiff cannot show she was treated differently than male employees, and hence discriminated against "because of her sex." Defendant asserts that Epps harassed both Plaintiff's male and female coworkers pointing to Plaintiff's interrogatory responses as proof **(Doc. 32, Ex. C, Pl.'s Answers to Def.'s First Set of Interrogatories at pp. 10-13)**. Plaintiff responds that in each reported incident, Epps directed the sexual comments at female employees **(Doc. 34, Pl.'s Resp. To Def.'s Mot. For Summary Judgment at p. 10)**. Plaintiff argues that "[w]hile [the] comments were made in conversations with males, there is no evidence that such discriminatory statements were made about any male employees" **(*Id.* at pp. 10-11)**. Plaintiff further asserts that "[w]hile in some instances the comments were made to male employees, their harassing nature was directed at female employees. In each incident the subject of the harassment was female and it was a female that was characterized as performing sex acts on males. It is clear that the male employees were not the subjects of harassment" **(*Id.* at p. 14)**.

The Seventh Circuit has explicitly held that Title VII does not cover the

"equal opportunity" or "bisexual" harasser because such a person is not discriminating on the basis of sex. **See Holman v. Indiana, 211 F.3d 399, 403 (7th Cir. 2000)("Title VII does not cover the 'equal opportunity' or 'bisexual' harasser, then, because such a person is not *discriminating* on the basis of sex. He is not treating one sex better (or worse) than the other; he is treating both sexes the same (albeit badly)."); Pasqua v. Metropolitan Life Ins. Co., 101 F.3d 514, 517 (7th Cir. 1996)("Harassment that is inflicted without regard to gender, that is, where males and females in the same setting do not receive disparate treatment, is not actionable because the harassment is not based on sex.")**. In this case, it is clear from both Plaintiff's deposition testimony and her answers to Defendant's Interrogatories that Epps, the alleged harasser, made derogatory comments to both male and female employees. For example, Plaintiff testified that Epps "would make very sexual remarks to [Larry Graham] here and there occasionally about him getting it in the rear end and did he like it and those type of things or who are you fucking this week, Larry" **(Dees Dep. at 117-18)**. Similarly, Plaintiff asserted that Epps told Larry Graham she wanted him to clean out her cobwebs **(Doc. 32, Ex. C, Pl.'s Answers to Def.'s First Set of Interrogatories at p. 11)**. According to Plaintiff, Epps also told David Counts, a male employee, to "Get down on your knees and eat me, you bastard (16 year-old boy)" **(*Id.*)**. Thus, the Court finds because Epps "harassed" both sexes, and Title VII does not cover the "equal opportunity" or "bisexual" harasser, Defendant is entitled to summary

judgment on Plaintiff's sexual harassment claim.

### C. Disability Discrimination Claim

The ADA protects "qualified individuals with a disability" from discrimination in their employment, the hiring process, or promotions. **42 U.S.C. § 12112**. As a threshold requirement, the plaintiff must first establish that she has a disability as defined by the ADA. ***Hoffman v. Caterpillar, Inc.,* 256 F.3d 568, 572 (7th Cir. 2001);** *see also **Krocka v. City of Chicago*, 203 F.3d 507, 512 (7th Cir. 2000)**. Under the ADA, a disability is:

> (A) a physical or mental impairment that substantially limits one or more of the major life activities …;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment.

**42 U.S.C. § 12102(2)**. Plaintiff admits that "at all times referred to herein, [she] was capable of performing all requirements of her job with the Defendant" foreclosing any argument that her heart condition substantially limited a major life activity at the time of her alleged demotion and constructive discharge **(Doc. 16, Amended Compl. Count II at ¶ 10)**. Hence, Plaintiff contends she was regarded as having such an impairment **(*Id.* at ¶¶ 8-9)**. Under the "regarded as" prong of the disability definition, the employer must believe, rightly or wrongly, that the employee has an impairment that substantially limits one or more major life activities. ***See Cigan v. Chippewa Falls Sch. Dist.,* 388 F.3d 331, 335 (7th Cir. 2004)**.

In this case, Plaintiff has failed to even identify a major life activity[1]. Assuming for purposes of the present analysis Plaintiff's major life activity is working, Plaintiff must show "an inability to work in a broad range of jobs." *See Kupstas v. City of Greenwood,* **398 F.3d 609, 613 (7th Cir. 2005)(quoting** *Toyota Motor Mfg., Ky. v. Williams,* **534 U.S. 184, 194, 200 (2002))**. Specifically, the Seventh Circuit has concluded that, except in "rare cases in which the [plaintiff's] impairments are so severe that [her] substantial foreclosure from the job market is obvious," she must present "some evidence of the number and types of other jobs" in the geographic region, from which she would be excluded because of her perceived impairments. *Id.* **at 613 (quoting** *EEOC v. Rockwell Int'l Corp.,* **243 F.3d 1012, 1017-18 (7th Cir. 2001))**. "The impairments must 'substantially limit employment generally,' not merely preclude an employee from performing 'either a particular specialized job or a narrow range of jobs.'" *Id.* **(citations omitted)**. Furthermore, "[a] plaintiff can never satisfy his burden by showing only that [her] employer believed that [s]he could not perform a specific job." *Id.* **(citing** *Toyota,* **534 U.S. at 200;** *Peters v. City of Mauston,* **311 F.3d 835, 843 (7th Cir. 2002))**.

Here, the Court finds Plaintiff's failure to provide evidence as to a class or range of jobs for which she was otherwise was qualified, and from which Defendant perceived her to be excluded is fatal to her case. Indeed, Plaintiff concedes that "[t]he only evidence [she] has to support her A.D.A. claim is the conduct and

---

[1] Major life activities include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." **29 C.F.R. § 1630.2(i)**.

statements of the Defendant's Assistant Manager, Ramona Epps" **(Doc. 34, Pl.'s Resp. To Def.'s Mot. For Summary Judgment at p. 16)**. Specifically, according to Plaintiff, Epps told her she was not going to assign her to day shift and demoted her from server/trainer to server because of Plaintiff's heart condition (*Id.*). Neither of these statements suggest that Epps, or Defendant for that matter, believed Plaintiff was precluded from a range of jobs. In fact, the statements suggest Epps believed that Plaintiff was able to perform as a server despite her heart condition. Put simply, the Court finds that Plaintiff has not carried her burden to show that she is disabled within the meaning of the ADA.[2] Accordingly, Defendant is entitled to summary judgment on Plaintiff's disability discrimination claim.

### D. Intentional Infliction of Emotional Distress Claim

Defendant argues that Plaintiff's IIED claim fails because it is preempted

---

[2] Plaintiff also alleged that Defendant constructively discharged her because of her disability **(Doc. 16, Amended Compl. at ¶ 9)**. To prevail on a claim for constructive discharge, an employee must show both that a hostile work environment existed and "that the abusive working environment became so intolerable that her resignation qualified as a fitting response." ***Rooney v. Koch Air, LLC,* 410 F.3d 376, 382-83 (7th Cir. 2005)(quoting *Pennsylvania State Police v. Suders,* 542 U.S. 129 (2004));** *see also McPherson v. City of Waukegan*, 379 F.3d 430, 440 **(7th Cir. 2004)(citations omitted)("The working conditions for constructive discharge must be even more egregious than the high standard for hostile work environment because . . . an employee is expected to remain employed while seeking redress.")** Beyond that, Plaintiff had to demonstrate that the constructive discharge was the result of her disability. **Id. (citing *EEOC v. Sears, Roebuck & Co.,* 233 F.3d 432, 440 (7th Cir. 2000))**. While Plaintiff's claim cannot succeed because of the Court's conclusion with respect to her disability, the Court notes as well that on this record she has not shown that the conditions of her employment even approached the intolerable levels normally required in constructive discharge cases. **See *Taylor v. Western & Southern Life Ins. Co.,* 966 F.2d 1188, 1191 (7th Cir. 1992)(finding constructive discharge where the employee's boss consistently made racial comments and on one occasion held a gun to his head, took a photo, and later showed it at a staff meeting while making racial jokes); *Brooms v. Regal Tube Co.,* 881 F.2d 412, 417 (7th Cir. 1989)(finding constructive discharge where the employee's human resource manager repeatedly showed her racist pornographic photos and made threatening comments to her including a threat to kill her)**.

by the Illinois Human Rights, and in the alternative fails as a matter of law. Defendant argues the IIED claim is preempted by the Illinois Human Rights Act because it mirrors the Title VII claim. Plaintiff asserts that "[i]t can be argued that violations of Federal law are not encompassed as part of the Illinois Human Rights Act and therefore Plaintiff[']s Intentional Infliction of Emotion Distress claim, viewed as based on violations of Federal law, should not be preempted by the Act" **(Doc. 34, Pl.'s Resp. To Def.'s Mot. For Summary Judgment at p. 18)**. The Court agrees with Defendant and finds Plaintiff's IIED claim preempted given the claim rests on the same allegations as Plaintiff's Title VII claim. ***See Quantock v. Shared Marketing Services, Inc.*, 312 F.3d 899, 905 (7th Cir. 2002)(affirming district court's grant of summary judgment because Plaintiff's IIED claim was supported by factual allegations identical to those set forth in her Title VII sexual harassment claim and therefore was preempted by the Illinois Human Rights Act)**.

### IV. Conclusion

In conclusion, the Court **GRANTS** Defendant's Motion for Summary Judgment **(Doc. 32)**. Plaintiff's Appeal to District Judge of April 6, 2005 Magistrate's Order Denying Motion to Amend Complaint is **DENIED** as moot **(Doc. 42)**. The Clerk is **DIRECTED** to enter judgment in favor of Defendant and against Plaintiff on all claims.

**IT IS SO ORDERED.**

Signed this 7th day of July, 2005.

/s/   David RHerndon
United States District Judge